**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHELLE STRICKLAND, | |
| Plaintiff, | |
| v. | No. 19-cv-02621 |
| THOMAS J. DART, in his official capacity as Sheriff of Cook County, BRAD SANDEFUR, in his individual capacity, COUNTY OF COOK, IL, as indemnitor only, JAMES SIROKY, and ROCHELLE PARKER, | Judge Franklin U. Valderrama |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle Strickland (Strickland), a correctional officer with the Cook County Sheriff's Office (CCSO), brings this lawsuit against Sergeant Brad Sandefur (Sandefur), Thomas Dart (the Sheriff), in his official capacity as Sheriff of Cook County, the County of Cook, IL (the County), Office of Professional Review (OPR) Investigator James Siroky (Siroky) and OPR Director Rochelle Parker (Parker) (collectively, Defendants) alleging that Defendants subjected her to a hostile work environment on the basis of her gender and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII), the Illinois Human Rights Act, 775 ILCS § 5/1-101 *et seq.* (IHRA), and her civil rights under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. R. 1[1], Compl. (bringing claims

_____

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

against Sandefur, the Sheriff, and the County); R. 119, Supp. Compl. (bringing claims against Sandefur, Siroky, and Parker). Specifically, Strickland alleges that Defendants discriminated against her based upon her race and gender by subjecting her to a hostile work environment and failing to take corrective action, and retaliated against her for reporting the discrimination. Sandefur's motion for summary judgment and the Sheriff and County's (County Defendants) motion for summary judgment are before the Court. R. 78, Sandefur Mot. Summ. J.; R. 82, County Defendants Mot. Summ. J. For the reasons stated below, the Court grants the motions for summary judgment.

## Background[2]

### I.    Material Facts

The following facts are set forth favorably to Strickland, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Strickland's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (citation omitted); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (citation omitted) ("Given this summary

---

[2]This background is derived from the parties' Local Rule 56.1 Statements of Material Facts, and the responses to those statements. *See* R. 80 (Sandefur's Statement of Facts); R. 89 (County Defendants' Statement of Facts); R. 92 at 1–13 (Strickland's Response to County Defendants' Statement of Facts); R. 92 at 13–18 (Strickland's First Statement of Additional Facts); R. 97 at 1–13 (Strickland's Response to Sandefur's Statement of Facts); R. 97 at 13–20 (Strickland's Second Statement of Additional Facts); R. 108 (Sandefur's Response to Strickland's Second Statement of Additional Facts); R. 110 (County Defendants' Response to Strickland's First Statement of Additional Facts).

judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence.

Strickland has been employed as a correctional officer with the CCSO since 2005. R. 97 ¶ 3. She has been assigned to the transportation unit since 2015, and took injury leave from approximately June 2015 through September 2017 after sustaining an injury on duty. *Id.* ¶¶ 4–5. When Strickland returned to work, Sergeant Sandefur was the sergeant on duty in the transportation unit during at least part of her shift. *Id.* ¶ 6.

The CCSO maintains written policies against harassment and discrimination in the form of a general order, and holds yearly training on harassment and discrimination in the workplace. R. 97 ¶¶ 7–8. Those policies are available to all employees online and were previously available in hard copy. *Id.* ¶ 9.

### a. Alleged Discrimination

To support her claims of discrimination, including her hostile work environment claim, Strickland identifies numerous specific incidents of alleged discrimination. *See* Compl. ¶ 25 (paragraph includes eighteen subsections (a)–(r)). Strickland identifies additional examples of discrimination that "emerged during discovery," including more general allegations of pervasive discriminatory conduct in the transportation unit, but Defendants contend that Strickland cannot base her claims on such incidents. R. 97 ¶ 10; *see* R. 111, County Defs. Reply at 3. For purposes

of the background section, the Court will describe the various incidents, as supported by the statements of facts and the record.

### i. Specific Incidents of Discrimination

**"[N]o woman . . ."** Strickland alleges that once, between April and June 2015, Strickland made Sandefur tea when he was sick. After she provided instruction as to how to add the lemon to the tea, Sandefur allegedly said, "no woman is going to tell me what to do." R. 97 ¶ 11. Strickland ignored the comment and walked away without any reaction. *Id.*[3]

**"You people have a lot of nerve."** Strickland alleges that on or about September 12, 2017, a couple days after she returned from her duty injury leave, she was in the transportation unit office looking at her calendar when Sandefur said to her, in the presence of others, that "You people have a lot of nerve trying to take days off." R. 97 ¶ 14. Strickland took that as an implication that she was lazy as a black woman. *Id.* In her deposition, Strickland testified that Sandefur actually said, "You people have a lot of nerve taking time off when you've been off for two years." *Id.* ¶ 15.

Strickland insists that Sandefur was referring to her gender and race, while Sandefur argues that he was referencing the fact that Strickland had just returned from leave. R. 97 ¶ 14. Strickland agrees that she "equivalates" the term "you people"

---

[3]Sandefur incorrectly claims Strickland did not include this incident in her EEOC charge. It appears in the attached pages, in Section II(C)(12)(f). R. 89-12 at 8 ("I had also previously brought Sergeant Sandefur some tea . . . [h]e stated in summary that 'no woman was going to tell him what to do.'").

with the term "you guys," and maintains that Sandefur was referring to black people when he said "you people." *Id.* ¶ 17. When asked why she thought Sandefur was referring to black people only, Strickland said, "The majority of our – A lot of [our] shift is black people." *Id.*; R. 80-1[4], Strickland Dep. at 191:3–6. She also acknowledged that when Sandefur said "you people," he was talking to "everybody who's standing there." R. 97 ¶ 17; Strickland Dep. at 190:7–9.

**"People who cannot communicate with you."** In or about November 2017, Strickland overheard Sandefur interrupt an argument between a white officer and a black officer by telling the white officer he should not "argue with people who cannot communicate with you." R. 97 ¶ 18. Strickland interpreted this comment to be based on race because, "There was a black man and a white man communicating […] It was a white man looking at another white man when he made the comment." *Id.* Sandefur maintains that he perceived the white officer to be the antagonist in the situation and says the two officers were yelling and not listening to each other. *Id.* ¶ 19. Strickland disputes that characterization, alleging that the black officer in this incident was Officer Louis Smith[5], who, as discussed *infra*, Sandefur later referred to as "Big Dummy," which Strickland alleges is a black stereotype. *Id.*[6] Strickland testified that

---

[4]This document does not contain all pages of Strickland's deposition that are cited in this opinion. The other pages can be found at R. 97-1.

[5]Strickland spells Officer Smith's name "Louis," R. 97 ¶ 19, while Sandefur spells his name "Lewis," *id.* ¶ 22. For the purpose of consistency, the Court will use Louis.

[6]Strickland cites to journal or news articles to support the proposition that "Big Dummy," "you people," "dumb," and "unintelligent" are common stereotypes associated with black men in particular. *See* R. 97 ¶ 19. She insists that the Court can take judicial notice of such facts, citing *Schmude v. Sheahan*, 312 F.Supp.2d 1047, 1064 (N.D. Ill. 2004), but those are not the

after this incident occurred, she turned to Sergeant Edwards, a black officer, and "I was like did you hear what he just said? I was like how could [Sandefur] say that, and Sergeant Edwards was just like, yeah, I heard him, but [Sergeant Edwards] just laughed it off and was like, yeah, [Sandefur] didn't mean anything by it." *Id.* ¶ 20; Strickland Dep. at 155:4–14.

**"Bad Officer."** On one occasion, another employee, Lieutenant Martin, joked to Strickland that "no one would be going home early that day." R. 97 ¶ 21. Strickland and Lt. Martin laughed. Strickland alleges that Sandefur then stated to Lt. Martin, "if anybody goes home, it is Strickland, she's my bad officer, she's my Campbell." *Id.* Sandefur and Lt. Martin laughed continuing in the joke. *Id.* Strickland did not know Officer Campbell, but knew she was black, and thus assumed the comment that she is bad was because she is black. *Id.* Strickland testified that there are several black officers in the transportation unit. *Id.* Strickland also testified that the majority of the shift she was assigned to was staffed with employees of color. *Id.* ¶ 17.

**"Big Dummy."** Strickland alleges that she heard Sandefur refer to Officer Smith, a black officer, as Big Dummy. R. 97 ¶ 22. She also heard other officers call Officer Smith that name, and she did not hear them call anyone else that name in

---

sort of facts of which the Court will take judicial notice. They do not qualify as "not subject to reasonable dispute" and either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Lysengen v. Argent Tr. Co.*, 498 F. Supp. 3d 1011, 1017 (C.D. Ill. 2020); Fed. R. Evid. 201(b); *see also Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1047 (7th Cir. 2019).

any other context. *Id.* Sandefur heard Lt. Martin and a deputy Jacinta Smith refer to Officer Smith as Big Dummy. *Id.* ¶ 23. Some officers occasionally complained to Sandefur about having to work with Officer Smith, and Sandefur admonished them for referring to Officer Smith as Dummy or dumb because Sandefur did not believe he was dumb, only that he made "bad decisions" about certain work-related and "antisocial behavior" things. *Id.*

**His Brother is the "worst n***** he knows."** On January 26, 2018, Strickland approached Sandefur to offer condolences about Sandefur's brother, who was extremely ill. Sandefur allegedly then told her not to take offense but that his brother, who is white, was "the worst n***** he knows." R. 97 ¶ 24. Strickland was offended, and while Sandefur went on to discuss his brother's problems and his family's situation, she said nothing and heard him out. *Id.* ¶ 24; Strickland Dep. at 181:10–14. She testified that she related the conversation to Officer Hannah, cried to Officer Hannah about it, and wrote down what happened. *Id.* ¶ 24; Strickland Dep. at 182:16–22.

**Van Dyke Verdict Comment by Voytas.** On one occasion at roll call, Sandefur stated that the Jason Van Dyke trial verdict was coming that day and people would be upset, so the officers should be careful. R. 97 ¶ 26. Officer Jason Voytas, who is white, then asked Strickland, "who's going to be upset, Strickland[?]". After Strickland stated, "I don't know," Officer Voytas responded with "black people." *Id.* ¶ 27. Sandefur contends that he did not make any statement specifically or vaguely about race, but Strickland disputes this, because Sandefur did "nothing

whatsoever to correct the situation" following Officer Voytas' comment. *Id.* Strickland did not interpret Sandefur's comment to have any racial context, and did not have any interpretation of the comment herself, but believed any interpretation was Officer Voytas' own. *Id.* ¶ 28.

Strickland testified that she knew Sandefur heard Officer Voytas' comments because "[i]t was said right there in the roll call area. We were all still standing there. . . . [Sandefur was] still at the podium, but I couldn't detail if he was talking or doing anything else." Strickland Dep. at 238:8–239:1. However, Strickland also agrees that (1) Sandefur did not hear Officer Voytas say anything specifically about black people, and (2) Sandefur told Officer Voytas to stop trying to start something. R. 92 ¶ 24.

**Roll Call – Vest.** In March 2018, Sandefur told Strickland to leave roll call because she was not wearing a bullet-proof vest, which had been issued to her by the department as part of her uniform. R. 97 ¶ 29. She was required to wear that department-issued vest, and in fact was not wearing the vest during roll call as required. *Id.* ¶ 30. Not everyone in the CCSO is issued vests, but if an officer is issued a vest, they are required to wear it. *Id.* ¶ 31. Strickland testified that she "believe[d] we all are issued bullet-proof vests[.]" Strickland Dep. at 195:22–23. Sandefur contends that he has told white male officers who were not wearing their issued vests at roll call to go get their vests. R. 97 ¶ 33 (citing R. 80-3[7], Sandefur Dep. at 122:18–23). Strickland disputes that assertion, stating that she testified that no one in the

---

[7]This document does not contain all pages of Sandefur's deposition that are cited in this opinion. The other pages can be found at R. 92-2.

roll call had a vest on at the time Sandefur confronted her, including a male officer named Berry. R. 97 ¶ 33; Strickland Dep. at 196:16–197:2. Sandefur testified that he did not believe he had "ever written anyone up for not wearing a vest," but recalled telling a white male officer—David Chraca—to go get his vest. Sandefur Dep. at 122:7–23. When asked, "Were there other black officers criticized for not wearing a vest?", Strickland answered, "I was the only one I recall being criticized for it." Strickland Dep. at 199:3–6. She was then asked, "So you have no recollection of any other black officer being criticized. Correct?" and she said, "No." *Id.* at 199:7–10. Strickland says she meant that she was the only black officer criticized during that single incident.

**Roll Call – Reprimand for Not Moving.** On or about April 10, 2018, there was an incident involving roll call when Sandefur told Strickland to move and she refused. R. 97 ¶ 36. Sandefur wrote her up and recommended a four-day suspension, but that was reduced to a written reprimand, and she never served a suspension. R. 108 ¶¶ 79, 95. Sandefur contends that he ordered her to stand with the group in a certain area and she refused to move, and ultimately he did not have the authority to recommend her for a four-day suspension. R. 97 ¶¶ 36–37. Strickland disputes part of that characterization, because she testified that he was "screaming and telling me to move across the room to a different spot and I just stood there. . . . I ended up talking to Lt. Martin about it. . . . I pretty much broke down and was like I'm tired of this dude[.]" *Id.*; Strickland Dep. at 200:4–11. Strickland further testified that she

"assum[ed]" Sandefur had the authority to issue a suspension. Strickland Dep. at 202:15–19.

**N-Word During Roll Call.** In her complaint, Strickland alleges that Sandefur stated "words to the effect that" he "[does not understand why White people cannot use the word N***** and does not understand by [sic] black people are eclipsing white people.]" R. 97 ¶ 43. Strickland testified that she based this allegation on a conversation she had with her partner, Officer Hannah, and Officer Hannah was paraphrasing what Sandefur said. R. 97 ¶ 43; Strickland Dep. at 207:8–17. Strickland said she did not know if Officer Hannah "directly heard [Sandefur] say it, but [Officer Hannah] just said like [Sandefur] doesn't understand, like [Sandefur] doesn't get the idea that you – he can't use that word." Strickland Dep. at 208:7–10.

Further, Officer Hannah told Strickland about an incident where Sandefur used the n-word at roll call, but Strickland did not witness this incident, either. R. 97 ¶ 44. Officer Hannah stated that he did not know whether Sandefur was referring to any individual when using the n-word, but did not "think so." *Id.* ¶ 45; R. 80-5, Hannah Dep. at 71:7–9.

Sandefur testified that he:

[S]tated to . . . stop the profanity. It's not professional . . . And now I'm hearing the use of a word that is totally not acceptable regardless of who you are, and that word is n*****, and you are not to use it, and they all went up in arms. I stopped them right there. I said, don't. You all just used it right around the corner. You use it every other day around here. Now I might have been exaggerating when I said that, but I was making a point. I said, and I used it for the shock value because you're all gonna stand there and say you can use it but I can't, and that's not true. I said, if you use it, it belongs to everybody. You can't say a word belongs to just a group.

10

Sandefur Dep. at 95:5–23.

Lt. Martin stated that he was not present at the roll call when Sandefur allegedly said the word, but testified:

> Sergeant Sandefur had addressed to me before that the officers in the locker room when conversing with each other would use the [n-]word, and he asked me about telling the officers to refrain from using the word. . . . There was the day when Sergeant Sandefur was in the hallway . . . and it was said and then he addressed in roll call saying the word . . . that word is inappropriate and should not be used.

R. 80-2, Martin Dep at 20:16–21:6 (Lt. Martin had no other recollections of Sandefur ever using the word). According to Strickland, "[Officer] Elmore could not state if anyone was offended who heard Sandefur use the word, but opined that everyone thought it was a joke." R. 92 ¶ 46. Strickland admits that Sandefur "used the N-word for shock value in roll call" and that "[Officer] Elmore confirmed hearing the N-word used on a daily basis in Transportation as slang since 2013[.]" *Id.* ¶ 50.

**Me Too.** Strickland asserts that on one occasion she overheard Sandefur say that the Me Too movement was unfair to men and that women should just get over it. R. 97 ¶ 47. Strickland did not respond and left the room immediately. *Id.* ¶ 48.

**"No Time For Stupidness."** Strickland alleges that in November 2018, when Strickland repeatedly inquired as to the staffing schedule for the female rotation, Sandefur stated he had no time for stupidness. R. 97 ¶ 49.

**Strickland's Jacket – "Show her who is the man."** On one occasion, Strickland and Officer Voytas were joking in conversation about a jacket Strickland had that Officer Voytas asked to see. R. 97 ¶ 50. Strickland alleges that Sandefur said to Officer Voytas that he should take charge of the situation, show her who is the

man, and take the jacket. *Id.* Strickland testified that Sandefur said this to "get a laugh" around the office, but she did not find the statement funny. *Id.*

**Bible – "women should honor men."** Strickland testified that she overheard Sandefur state to Sergeant Edwards and Officer Maxwell that the Bible says that women should honor men. Sandefur did not make the comment to her, and she just walked out after hearing it. R. 97 ¶ 51.

**Black History Month.** In February 2019, Officer Elmore asked Sandefur for a favor during roll call. Sandefur could not hear exactly what it was and said, "Whatever it is, no." R. 97 ¶ 52. Officer Elmore stated in response, "But Sarge, it's Black History Month." *Id.* Sandefur replied that he did not care if it was Black History Month or Chinese History Month and what matters is that they are all blue. *Id.* Strickland remarked that what Sandefur had just said was offensive. *Id.* ¶ 53. Sandefur stated that "the only thing that matters is that we're all blue, we're all the same color." *Id.*

**"Girl, . . ."** Strickland alleges that Sandefur said to her, "girl, you sound like you're getting sick," when she was in fact sick and her voice was becoming raspy. R. 97 ¶ 59. Sandefur testified he heard another officer, Jacinta Smith, refer to Strickland as girl when conversing with her. *Id.* (citing Sandefur Dep. at 164:8–22).

## ii. Other Allegations of Misconduct

Beyond the specific instances mentioned above, Strickland alleges that on occasion she overheard Sandefur make comments regarding the Bible's statements on women obeying their husbands and comments that he runs his household, and his

12

wife would not tell him what to do. R. 97 ¶ 13. These comments were not made to Strickland. *Id.*

When asked specifically what terms and conditions of employment were different under Sandefur's chain of command, Strickland testified that she was subjected to different terms because Sandefur would interrupt her private conversations. R. 97 ¶ 58. She believed that Sandefur "speaks differently to me." *Id.* (Sandefur butts into other officers' conversations too but "it's just a different way that he presents and talks to me."); *see* Strickland Dep. at 151:14–23.

Strickland also testified that Sergeant Edwards once told her to "come over here and brush my beard hair for me, I'm the man." R. 92 ¶ 61. She told him she was offended, and he apologized. *Id.*

Regarding widespread discrimination at the CCSO, Strickland testified that black men "were left on Markham [runs]" by various supervisors for "months at a time as a form of punishment[.]" Strickland Dep. at 114:12–117:20. When asked if only African-Americans were assigned to the Markham runs, she said, "I would not say indefinitely it was all African-Americans, I cannot make that statement because every race has worked that run, but in the past, it was a punishment run. To date, it's a lot more fair than what it used to be[.]" *Id.* at 118:17–119:4 (also stating that not every shift rotated assignments). Strickland also identified the temporary transfer of one Sergeant as an incident of racial discrimination, because the position was not posted, but she did not know the Sheriff's reasons for transferring this Sergeant or what had happened behind the scenes prior to the Sergeant being

transferred. R. 92 ¶ 70. Lastly, Sandefur confirmed that the n-word is used on a rampant basis in the transportation unit. R. 108 ¶ 75. He could remember three specific instances of the n-word being used by officers in the transportation unit, and he heard Lieutenant Deadens use it and Officer Barrios use it in conversation with Sergeant Edwards. *Id.* He confirmed that people say the n-word and the b-word a lot. *Id.*

### b. CCSO Discipline and Strickland's Informal Reporting

Sandefur asserts that he does not have the authority to administer discipline, but only has the authority to issue a write-up for discipline. R. 97 ¶ 39 (citing Sandefur Dep. and R. 80-4, Manning Dep). Strickland disputes that, citing only her own deposition. R. 97 ¶ 39 (citing in part Strickland Dep. at 202:2–11 ("I received . . . a writeup for four days. Actually, Lt. Martin told me, well, he's probably going to write you up for this situation and I was like for what. He's like he gave you a direct order to move from one place to another place and you didn't do it and I'm like seriously, so.")).

Strickland informally reported at least some of Sandefur's conduct to Lt. Martin, who was deposed in this case, but the parties dispute the characterization of Lt. Martin's testimony regarding Strickland's reporting. R. 97 ¶¶ 40–42. Strickland asserts that she reported Sandefur's "racism, screaming, hollering, and belittling [ ], told [Lt. Martin] that she cannot keep dealing with [Sandefur], reported the fact that Sandefur called his brother the 'worst N-word that he knows', that Lieutenant Martin

14

did nothing as a result of Strickland's report." *Id.* ¶ 40 (citing Martin Dep. at 17:3–5) (Lt. Martin could not "recall exactly" the nature of his conversations with Strickland).

In his deposition, Lt. Martin said that Strickland came to him "probably at least four or five times" and he "would always tell her that if she had anything that she needs to report to me, she needs to write it to me either on a document or just E-mail the information, and I would forward it on." Martin Dep. at 14:9–18. He further testified that Strickland "challenged the assignments and then she would address them as if she was being discriminated against, and then I would have to show her the same assignments given to other officers on different occasions." *Id.* at 17:11–19. Every time Strickland complained to Lt. Martin, he told her to put her complaint in writing so he could pass it on, and advised her that she had the option to report any complaint to the Office of Professional Review (OPR). R. 97 ¶ 42; *see* Martin Dep at 18:2–10 ("[S]he never gave it to me formally.").

Strickland asserts that she also reported Sandefur's conduct to Lieutenant Ledesma, specifically the comment about Strickland's "stupidness." R. 108 ¶ 96. Strickland says Ledesma encouraged her not to report anything, but Sandefur disputes that characterization, because Strickland testified that Ledesma said, "Strickland, don't worry, you know, I'm going to do it fair, you're going to be back in the rotation, just don't say anything." Strickland Dep. at 226:16–21.

### c. Strickland's Equal Employment Opportunity Commission (EEOC) Charge

On July 10, 2018, Strickland filed a charge with the EEOC alleging continuing violations based on her race and gender. R. 92 ¶ 31; R. 108 ¶ 93; R. 1-1 at 1 (Charge

Number 440-2018-06566, accompanied by right to sue letter dated March 13, 2019); R. 89-12 at 2–10. She contends it lists all the same incidents alleged in her complaint, but Sandefur disputes this. R. 108 ¶ 93. The EEOC charge does allege, in part, that: Sandefur said the n-word at roll call, Strickland was kicked out of roll call for not wearing a vest when white officers were not, Sandefur said she was his "bad officer," Sandefur called his brother the "worst n-word he knows," Sandefur told an officer not to "argue with people who cannot communicate with you," Sergeant Edwards "just laughed" and provided no resource when Strickland told him she was offended, Sandefur stated "you people" have a lot of nerve trying to take days off, Sandefur talked about white people being eclipsed by black people and that he did not understand why he cannot use the n-word, and Sandefur told Strickland that "no woman was going to tell him what to do." R. 89-12 at 2–10.

### d. OPR Complaint Register and Alleged Sham Investigation

Seven months after filing her EEOC charge, on or about February 5, 2019, Strickland filed a complaint register with the Office of Professional Review (OPR) complaining about the incident regarding Black History Month. R. 97 ¶¶ 54, 57 (citing Strickland Dep. at 241:15–242:1, 316:18–317:10); R. 108 ¶ 97. Three days after Strickland submitted her charge to OPR, Mary Robinson, the Sheriff's Human Resources Department Equal Employment Opportunity Specialist, attempted to email Strickland to discuss whether HR could do anything to help her with the situation. The email, which was produced to Strickland in discovery,[8] was

---

[8]In her response to the County Defendants' statement of facts, Strickland argues that they violated Rule 56 by including these facts about Robinson's emails to Strickland, because the

inadvertently addressed to a different employee named Michelle Strickland. R. 92 ¶ 62. On April 10, 2019, Robinson emailed Strickland stating that she knew Strickland had complained to OPR, and Robinson explained that she had met with Sandefur, instructed him not to go to the transportation unit, and offered to meet with Strickland.

Strickland was interviewed by OPR four days after she filed her charge. R. 97 ¶ 54. Sandefur was reassigned to a different post approximately one month after this incident. *Id.* ¶ 55; Compl. ¶ 27 (alleging Sandefur's transfer in or about March 2019). Strickland agrees that she was always aware that she was able to complain to OPR about Sandefur's conduct. *Id.* ¶ 56. Before February 2019, Strickland did not (1) complain to OPR about any of Sandefur's behavior or (2) submit any union grievance about any of Sandefur's conduct, aside from the write-up for a suspension he issued to her. *Id.* ¶ 57. Strickland maintains that she did not file an OPR report sooner because she was afraid of retaliation and feared the consequences of filing a written complaint about discrimination. R. 108 ¶ 77.

Norelis Martinez, an investigator with the OPR who has never worked as a correctional officer, was assigned to investigate Strickland's OPR complaint register. R. 108 ¶ 80. She completed an OPR report and confirmed that it contained all the witness statements she took. *Id.* She also confirmed that the allegation Strickland

---

cited evidentiary material does not have a proper foundation. R. 92 ¶ 62 ("Plaintiff gives no response to this paragraph" because the facts should be "disregarded."). But Strickland does not argue that the cited material cannot be presented in any "form that would be admissible at trial," nor does she deny that she could provide the foundation for the document, which was sent to her. Therefore, the Court considers the facts. *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 2019 WL 955354, at *10 (N.D. Ill. Feb. 27, 2019).

made against Sandefur in her OPR complaint was about unprofessional racial discrimination and disrespectful and discourteous behavior towards staff. *Id.*

Martinez interviewed four witnesses and Sergeant Sandefur during her investigation but did not interview Strickland. R. 108 ¶ 81. Martinez testified that Strickland had already been interviewed by Ramirez, another investigator, when she received the case. R. 108-4, Martinez Dep. at 13:18–14:2. Specifically, Martinez interviewed: (1) Officer Juan Herrera, but did not verbatim record what Herrera told her, and recorded only key points. R. 108 ¶ 81; *see* Martinez Dep. at 18:23–19:8 (Martinez "might have" asked Herrera why Sandefur was discussing black history at work, but "if I did his response would have been in the report, so it's possible that I did not."); (2) Officer Voytas, typing up a summary of his statement and confirming it was a complete recordation; (3) Sergeant Edwards, typing up a summary and confirming that it was a complete recordation; and (4) Officer Elmore, typing up a summary and confirming that it was a complete recordation, though Martinez could not recall asking Officer Elmore why Sandefur told the roll call to stop using the n-word. R. 108 ¶ 81.

Mary Robinson wrote a memo to Martinez stating that Strickland may have raised issues regarding discrimination, but Martinez did not interview Robinson as part of her investigation. R. 108 ¶ 82. Robinson found Sandefur's comment about Black History Month offensive and thought it lacked empathy. *Id.* ¶ 102. On her complaint register, Strickland also listed Reginald Berry, C. Lacey, E. Hudson, and

S. Frazier as witnesses, but Martinez did not interview them and could not recall why she did not. *Id.* ¶ 82.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (internal quotation marks and citations omitted). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d

697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

Strickland alleges that Sandefur, the Sheriff, and the County (collectively, hereafter, Defendants[9]) discriminated against her on the basis of her gender and race by subjecting her to a hostile work environment and failing to take corrective action after she reported discrimination. Compl. ¶¶ 4, 19 ("All of the acts complained of herein in the aggregate . . . are plead as one ongoing hostile work environment[.]"). She further alleges that the Sheriff has "engaged in a policy, pattern, and practice of discrimination" and subjected her to "unequal and discriminatory treatment." *Id.* ¶¶ 36–37, 42–43, 47–48, 53–54. She asserts that the County Defendants thus violated Title VII and the IHRA, and Sandefur violated her rights under the Fourteenth Amendment. Compl.

## I. *Monell* Claim and Disparate Impact

As a threshold matter, the County Defendants argue that Strickland does not bring a *Monell* claim or a clear claim for any disparate treatment based on a policy, pattern, or practice, even though she uses the terms policy, pattern, and practice in her complaint. R. 84, County Defs. Memo at 7 ("Her claims are based upon the hostile work environment theory, not a disparate treatment theory.") (citing *Perez v. Cook Cnty. Sheriff's Off.*, 2020 WL 777288, at *7 (N.D. Ill. Feb. 18, 2020) (plaintiff failed to

---

[9]Sandefur and the County Defendants incorporate and join each other's statements, analysis, and arguments from their respective briefs. R. 79, Sandefur Memo at 1 n.1; R. 84, County Defs. Memo at 1 n.1. Therefore, the Court sometimes refers to the arguments of "Defendants" rather than the individual parties.

state a pattern or practice claim because she alleged a "generalized list of wrongs" but failed to support a plausible inference that the defendants engaged in discriminatory activity "as their standard operating procedure."); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 274 (N.D. Ill. 2019) ("Pattern-or-practice claims require a 'showing that an employer regularly and purposefully discriminates against a protected group.'")). Strickland does not respond to this argument or maintain that she states a *Monell* claim, so it is waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver" and "silence leaves us to conclude" a concession). Further, as argued by Sandefur, Strickland's failure to address his arguments regarding any claim of disparate treatment also constitutes abandonment of those claims. *Id.*; R. 109, Sandefur Reply at 2–3. Because Strickland has abandoned any *Monell* or separate disparate impact claim, the Court will solely analyze Strickland's claims of a hostile work environment.

## II. Hostile Work Environment and Title VII, the Fourteenth Amendment, and the IHRA

Title VII's prohibition against discrimination "by employers includes a prohibition against creating a 'hostile or abusive work environment.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). In the discrimination context, Strickland's § 1983 equal protection claims against Sandefur mirror the standards used under Title VII. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015) ("Stating a hostile work environment claim under Title VII therefore establishes a viable claim to § 1983 relief."). To prevail on a hostile work environment claim, Strickland must demonstrate four elements: (1) that she was

21

subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII, like race or gender; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 560 (7th Cir. 2019). To succeed on her IHRA hostile work environment claim, she must show that the conduct "was severe or pervasive enough to create a work environment that a reasonable person would find to be hostile or abusive" and that she "herself subjectively perceived [it] to be hostile or abusive." *Cook Cnty. Sheriff's Off. v. Cook Cnty. Comm'n on Hum. Rts.*, 53 N.E.3d 1144, 1154 (Ill. App. Ct. 2016) (standards for determining whether conduct was 'severe or pervasive' under Title VII and 'hostile or abusive' under the IHRA overlap).

"In determining whether the conduct is sufficiently severe or pervasive to be actionable, the court looks at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Scaife v. U.S. Dep't of Veterans Affs.*, 504 F. Supp. 3d 893, 903 (S.D. Ind. 2020), aff'd sub nom. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109 (7th Cir. 2022) (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself,

to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago,* 713 F.3d 325, 331 (7th Cir. 2013) (citation and quotation omitted). Ultimately, the "core question for the court is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Scaife*, 504 F. Supp. 3d at 903 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

## III.    Strickland's EEOC Charge, Exhaustion, and Secondhand Evidence

First, the County Defendants argue that Strickland's claims of a widespread environment of harassment should be limited only to Sandefur's conduct, because Strickland did not include allegations about anyone else's conduct in her EEOC charge. "As a precondition to filing claims under Title VII," a plaintiff must "file a charge with the EEOC," which serves to give the parties a chance to settle and the employer notice of the employee's grievances. *Huri*, 804 F.3d at 831 ("Courts review the scope of an EEOC charge liberally," and for a plaintiff's claim to be cognizable, it must simply be "like or reasonably related to the allegations of the charge and growing out of such allegations[.]"). Because Strickland did not exhaust her complaints about conduct by anyone but Sandefur, reason the County Defendants,

the Court's analysis of her hostile work environment claims should focus solely on the allegations concerning Sandefur. County Defs. Memo at 8.

In response, Strickland cites only to her reference of Sergeant Edwards in her EEOC charge. Indeed, the only other person besides Sandefur that Strickland directly mentions in her EEOC charge is Sergeant Edwards, who allegedly "just laughed" and "provided no recourse when [Strickland] stated [she] was offended by [one of Sandefur's statements]." R. 89-12 at 5; *id.* at 9 ("I . . . am under emotional distress and anxiety from *his* disparate treatment of me. I . . . am living in a state of fear of crossing Sergeant Sandifer [sic], despite *his* behavior.") (emphasis added). Strickland asserts that the County Defendants read her EEOC charge "too conservatively." R. 93, Pl. Resp.[10] at 2 (citing *Conley v. Village of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000) ("A plaintiff may pursue a claim not explicitly included in the EEOC complaint only if [his] allegations fall within the scope of the charges contained in the EEOC complaint.") (internal citation omitted)). Strickland only brings up one incident that she argues is not explicitly stated, but is within the scope of, her EEOC charge; she argues that in addition to Sandefur's behavior, the Court must consider the beard-brushing comment made by Sergeant Edwards, which she says "may be used by [her] as part of the convincing mosaic demonstrating a workplace permeated with harassing conduct . . . for purposes of the Sheriff's and County's official liability." Pl. Resp. at 3 ("The logic from *Johnson* certainly applies to

---

[10]The Court cites to Strickland's response to the County Defendants' Memo, without citing to Strickland's response to Sandefur's Memo, because the latter is almost entirely a copy of the former, and includes no separate or additional information or argument.

Sergeant Edwards' comment – though it is not a specific basis for this lawsuit, certainly it relates to the original EEOC charge and is good evidence of the overall work environment of which [Strickland] ultimately complains.").

The Court agrees that the beard-brushing comment allegedly made by Sergeant Edwards, *see supra*, at 13, is "reasonably related to" the claims made by Strickland in her EEOC charge, and so falls within the scope of that charge, so the Court will consider it in analyzing the hostile work environment claim. *Conley*, 215 F.3d at 710; *see Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (The "EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*.") (emphasis in original). However, because Strickland's EEOC charge is limited to allegedly discriminatory conduct by Sandefur and Sergeant Edwards, the Court will not consider conduct from anyone else in its analysis. *Cheek*, 31 F.3d at 501. This includes, for example, any allegations by Strickland about the rampant use of the n-word by black officers or white officers besides Sandefur, which are also not included in her EEOC charge.

Next, Defendants argue that Strickland cannot rely on conduct she did not witness to prove that she was subjected to a hostile work environment. They insist that an employer can be held liable only when a plaintiff shows her own exposure to discrete incidents of harassment, rather than an environment of harassment experienced by others. County Defs. Memo at 9 (citing *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 603 (7th Cir. 2021) ("Indeed, we have repeatedly rejected hostile work environment claims that rest primarily on secondhand harassment.") (citing

cases); *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at *2 (N.D. Ill. Oct. 23, 2007)).

However, as Strickland argues, Seventh Circuit case law is clear that such secondhand harassment can be considered by the Court, though that sort of evidence has a less severe impact on plaintiffs. Pl. Resp. at 3–4 (citing *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 902 (7th Cir. 2018); *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 n.2 (7th Cir. 2011) ("In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment.")). When analyzing the facts in *Johnson*, the Seventh Circuit divided the incidents of racially derogatory speech into three categories: "comments made directly to plaintiffs; comments made directly to non-plaintiff co-workers and comments made to non-plaintiffs about which others were aware." 892 F.3d at 901. The court emphasized that "[c]omments made to non-plaintiff co-workers carry less weight in the evaluation of a hostile environment claim, but they are not irrelevant." *Id.* (citing *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) ("When harassing statements are 'directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.'") (citation omitted)). The Seventh Circuit further explained:

> The weakest evidence the plaintiffs present is evidence about comments that they were told supervisors made—in other words, hearsay. . . . Although these comments are largely hearsay, and in some cases, double hearsay, some of it could be admitted under hearsay exceptions. For example, it is evidence, not of the veracity of the remark of course, or even of the truth as to whether Castillo uttered it or not, but of the fact that employees understood their environment to be one in which derogatory statements were pervasive. This latter group of evidence might have some bearing in a trial on the merits, but it would be for

> the district court to determine whether these comments were more prejudicial than probative. We would caution against elevating workplace rumors to evidence of a hostile work environment, although coupled with other evidence this testimony might have relevance in a hostile work environment claim.

*Johnson*, 892 F.3d at 902–03; *see Yuknis v. First Student, Inc.*, 481 F.3d 552, 555–56 (7th Cir. 2007) (offense based on hearsay or rumor is second hand, and less credible and confrontational, therefore less wounding than first hand offense based on hearing or seeing). Accordingly, the Court will not disregard secondhand harassment evidence, or even all hearsay evidence, but will consider that such evidence has a less severe impact on Strickland than direct harassment. *Johnson*, 892 F.3d at 901–03 (compared to comments made directly to plaintiffs, comments to non-plaintiffs "carry less weight" and hearsay evidence is the "weakest").

## IV.    Severity and Pervasiveness

Defendants primarily argue that Strickland fails to show that Sandefur's alleged conduct was sufficiently severe or pervasive to alter the conditions of her employment. County Defs. Memo at 1; *see Johnson*, 892 F.3d at 901 ("In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive."). Ultimately, considering all the evidence in the light most favorable to Strickland, the Court holds that no reasonable jury could find the conduct here so severe or pervasive that it altered the conditions of Strickland's employment.

As an initial matter, the Court finds that Sandefur was not Strickland's supervisor for Title VII purposes. In the context of Title VII, "'supervisor' is a term of art that denotes more than an individual with a higher rank, a superior title, or some

27

oversight duties." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). A supervisor can "affect the terms and conditions of employment." *Id.* (occasional authority to oversee some aspects of a plaintiff's work does not suffice to make a supervisor, nor, necessarily, does directing or managing a plaintiff's work activities, providing evaluation input to a supervisor, or training a plaintiff). "The paradigmatic supervisor is an employee who has the authority to fire the plaintiff, because by giving him that authority the employer has armed him to intimidate the employees whom he supervises." *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006).

Defendants reason that because Sandefur, as a correctional sergeant, did not have any power to hire, fire, promote, reassign, or make a decision that would change Strickland's benefits or terms of employment, he was not her supervisor within the meaning of Title VII. *See Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Strickland does not respond to that point or provide evidence that Sandefur had the ability to affect her terms and conditions of employment. Instead, Strickland argues only that the CCSO cannot escape liability "even if Sandefur did not have the power [of a supervisor]," seeming to concede the point. Pl. Resp. at 12–13 ("In this case, even if Sandefur did not have the power to hire, fire, promote, reassign, or make any decision that would change Plaintiff's benefits or terms of employment to establish supervisory authority within the context of Title VII interpretation, the CCSO cannot escape liability . . .").

The Court agrees that Sandefur was not Strickland's supervisor for Title VII purposes. First, Strickland has waived the argument by not responding to it. *Bonte*,

28

624 F.3d at 466. Second, while Strickland testified that she assumed Sandefur had the authority to discipline her, she has presented no record evidence of Sandefur's authority to do so, besides that he merely recommended her for discipline. She admits that despite Sandefur writing her up for a suspension for refusing to follow a direct order, his recommended suspension was reduced to a written warning—evincing that he lacks the authority to impose discipline. In addition, the County Defendants point out that the ability to hire, fire, or suspend officers for longer than 30 days is not even vested in the Sheriff's Office, but is solely within the Cook County Sheriff's Merit Board's authority. County Defs. Memo at 19 (citing 55 ILCS 5/3-7012).

Next, Defendants contend that certain alleged conduct was not directly related to Strickland, and so does little to support a showing of a hostile work environment. County Defs. Memo at 11 (citing *Yuknis*, 481 F.3d at 555) ("The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's environment was actually made unbearable[.]"). For example, they argue that Sandefur's use of the n-word at roll call—which is perhaps the most severe allegation—constitutes hearsay as Strickland heard the story from Officer Hannah. County Defs. Memo at 9–10 (citing *Galdikas v. Fagan*, 342 F.3d 684, 695 (7th Cir. 2003) ("Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial[.]") (internal quotations and citation omitted)). And as an incident that she did not witness, it lends little support to her claims of personal harassment by Sandefur. County Defs. Reply at 4.

29

Defendants also argue that other incidents, while perhaps rude or offensive, were not relevant to Strickland personally and do not show a discriminatory animus. County Defs. Memo at 11. Defendants emphasize that Strickland alleges few incidents where Sandefur actually directed a comment at her: (1) the 2015 incident where she made him tea and he said no woman would tell him what to do; (2) the September 2017 incident when he told a group that "you people have a lot of nerve" trying to take days off; (3) the January 2018 incident when he called his own brother the n-word; (4) the comment where he called her "girl"; and (5) when he told her he had no time for "stupidness." In all other instances, assert Defendants, Sandefur was speaking to other people or Strickland was not even present. *See Yuknis*, 481 F.3d at 556 ("The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them.").

Defendants further attack certain allegations as common, informal expressions too common for a reasonable jury to find severely offensive or pervasive. For instance, Sandefur called Strickland "girl" once, after another officer had called her girl, and he once told Officer Voytas to "be a man" and take her jacket. County Defs. Memo at 12–13 (citing *Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious)" are not changes in terms and conditions of employment.)).

Other comments, they argue, do not show a discriminatory animus at all. R. 79, Sandefur Memo at 8–9 (citing *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d

888, 896–97 (7th Cir. 2016) ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be *some* connection, for 'not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.''") (quoting *Zayas v. Rockford Memorial Hospital*, 740 F.3d 1154, 1159 (7th Cir. 2014)); *see Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) ("[W]e underscore that [the co-worker's] conduct need not have been explicitly sexual or racial in order to create a hostile environment. . . . The complained of conduct must have either a sexual or racial character *or purpose* to support a Title VII claim.") (emphasis in original). Defendants contend that Strickland instead relies entirely on her subjective interpretation of Sandefur's comments. For instance, calling an employee "Big Dummy," Sandefur's comment that he had no time for "stupidness," and Sandefur's use of "you people" do not on their face implicate gender or race. County Defs. Memo at 13 (citing *Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016) (statements fell "at best on the less severe end," and "were at worst mild and ambiguous," where (1) employee "threw a toy monkey" at the plaintiff and said that management intended to "get the monkeys off the backs of management"; (2) an employee referred to Poullard as a "sugar daddy"; and (3) an employee commented that Poullard was a "better person" than before, referencing an older photograph in which Poullard had an afro hairstyle).

Strickland responds that the cases instruct that it is for the jury to consider if harassment is so severe or pervasive as to constitute a hostile work environment. Pl.

Resp. at 4–6 (citing *Passananti v. Cook Cnty.*, 689 F.3d 655, 669 (7th Cir. 2012) among others). She does not directly counter Defendants' arguments about individual incidents being secondhand, isolated, or lacking discriminatory animus or hostility. *See id.* Nor does she dispute the context in which each of Sandefur's statements were made. She merely points out, correctly, that "comments made to others 'are not irrelevant' in a hostile work environment analysis, though they carry less weight." Pl. Resp. at 7 (citation omitted).

The Court agrees, in part, with Defendants' characterization of most of the alleged incidents as not being directed at Strickland. The incidents that were simply overheard by Strickland, including Sandefur calling Officer Smith "Big Dummy" and Sandefur's comments about the Me Too movement and the Bible, are weaker pieces of evidence because such secondhand harassment is less severe. *Johnson*, 892 F.3d at 901 (contrasting comments made directly to plaintiff with comments made to directly to co-workers and comments made to co-workers about which others were aware). However, viewing the evidence in the light most favorable to Strickland, the Court construes the comment stated to Lt. Martin about Strickland being Sandefur's "bad officer" as directly involving Strickland. While Strickland admits that Sandefur intended it as a joke, it was said in Strickland's presence and directly referenced her, so it cannot be characterized as secondhand. Similarly, Sandefur's comment to Officer Voytas that he should be a man and take Strickland's jacket, said in Strickland's presence directly about her piece of clothing, is not secondhand evidence. These

comments, while technically not made to Strickland, were clearly intended for Strickland's ears and directed at her as well as Lt. Martin and Officer Voytas.

The Court also agrees with Defendants that Strickland relies on "an inflammatory recitation of the alleged facts stripped of the context or explanation that has been established in discovery," and that in context most of the comments and incidents are relatively mild. County Defs. Reply at 6; Sandefur Memo at 9–10 (citing *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) ("All of the criticisms used non-racial language, and nothing else about their context suggests that they were racially motivated.")). Indeed, numerous comments "do not support a reasonable inference of discriminatory animus, nor are they overtly hostile in any objective sense." *Poullard*, 829 F.3d at 858. (1) Sandefur calling Officer Smith "Big Dummy" is not objectively racial (though it is certainly disparaging), especially in a context where Big Dummy appears to be Officer Smith's unfortunate nickname: other employees called Officer Smith "Big Dummy," Sandefur called no one else "Big Dummy," employees complained about working with Officer Smith, and Sandefur told others *not* to call Officer Smith "Big Dummy." (2) Calling Strickland "girl" is a gendered comment, and even inappropriate, but it is hardly objectively hostile when used in the innocuous context of noticing someone sounds ill. (3) Strickland admits that when Sandefur said "you people have a lot of nerve," he specifically referenced Strickland having just returned from taking two years off. Strickland still urges that the comment was directed at her due to her gender or race, rather than as a person who just took time off. But she only supports that inference by referring to her own

race, and that she was the only person standing there. As Defendants argue, the comment was inappropriate, and perhaps even cruel. But without any evidence that this comment was not based on time taken off, the Court cannot conclude that this was a discriminatory comment based on race or gender. County Defs. Memo at 15. (4) In Strickland's retelling of Sandefur's "bad officer" comment, Sandefur made the comment after Lt. Martin made a joking comment to Strickland about going home early. In response, Strickland laughed. Thus, while Strickland interprets the comment to be racial, it is more likely that Sandefur teasingly made the comment after Lt. Martin jokingly assumed that Strickland had asked to go home early. Strickland's allegation that this comment was racial is not supported by the record, especially considering the alleged racial composition of the transportation unit. (5) When Sandefur mentioned that people would be upset by the Van Dyke trial verdict, it was Officer Voytas that made a comment about black people specifically, and Strickland admits that Sandefur told Officer Voytas to stop trying to start something. This shows no intent to discriminate on behalf of Sandefur. (6) When Sandefur said he had no time for "stupidness," he was merely dismissing a question, though perhaps inappropriately. Strickland provides no justification for this being interpreted as racial or gendered. (7) Lastly, the comment involving "people who cannot communicate with you" (namely, Officer Smith) is more likely explained as non-racial. By this comment, Sandefur was referring to Officer Smith, who may have actually lacked communication skills as evinced by the fact that he appears to have been nicknamed "Big Dummy" by those in the transportation unit.

Certainly, the above comments, interpreted in the light most favorable to Strickland, are condescending, belittling, or offensive. But "[w]e expect a certain level of maturity and thick skin from employees[,]" and "[d]iscrimination laws do not mandate admirable behavior from employers[.]" *Johnson*, 892 F.3d at 900.

In addition, Sandefur's admonishments of Strickland for not wearing her vest and for not moving during roll call do not support a reasonable inference of discriminatory animus. While Strickland says other white male employees were not wearing vests and were not admonished, she has not shown that any of those employees had been issued vests or were required to wear them. County Defs. Memo at 14. She admits that she violated rules both when failing to wear her vest and when failing to move when instructed during the roll call. There is no proof that Sandefur treated male or non-black employees differently for engaging in the same conduct. Accordingly, the Court cannot infer gender or racial animus.

All of that said, Defendants admit that Sandefur's statements regarding Black History Month and his use of the n-word to refer to his brother were explicitly racial. Further, Strickland witnessed the former, and the latter was said to her, though not about her. However, Defendants argue that these comments, even when considered with the other evidence, are not sufficiently severe or pervasive to change the conditions of Strickland's employment. County Defs. Memo at 16 (citing *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) ("[A]n objectively hostile work environment will not be found where '[m]ost of the conduct that forms the basis of [a

plaintiff's] claim consists of derogatory statements made . . . out of her hearing,' and the rest is 'isolated and not particularly severe.'") (citation omitted)).

First, Strickland testified that Sandefur made the Black History Month comment after a black officer joked that they should be allowed to say what they want because it was Black History Month. Defendants contend it is clear that when Sandefur made his allegedly discriminatory comment, Sandefur meant that he did not care whether it was Black History Month when it came to how all the officers were doing their jobs, as he insisted that what mattered was that they were all law enforcement (or "blue"). County Defs. Memo at 16. While the comment is nonetheless offensive, the Court agrees with that characterization; Sandefur did not, in contrast, make a blanket statement that he simply did not care about Black History Month.

Second, Sandefur calling his white brother the n-word was undoubtedly ignorant, rude, and bizarre, but Defendants argue that it was directed neither at Strickland nor another black person, with no racial animus intended. County Defs. Memo at 16 (citing *Edmond v. City of Chicago*, 2018 WL 5994929, at *12 (N.D. Ill. Nov. 15, 2018) ("[T]he Seventh Circuit has treated a supervisor's use of racial epithets, such as 'n*****,' directed at an employee as nearly per se hostile" but when harassment is "directed at someone other than the plaintiff, the 'impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.'") (citations omitted); *E.E.O.C. v. RJB Properties, Inc.*, 857 F. Supp. 2d 727, 754–55 (N.D. Ill. 2012) (The "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions

36

of employment to implicate Title VII[.]"); *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (affirming summary judgment for defendants on hostile work environment claim when the plaintiff heard a white officer refer to two other officers as "black motherfuckers" and was told that the white officer referred to them by the n-word, because the words were not directed at the plaintiff and "[o]ne utterance alone does not create an objectively hostile work environment.")). Again, Defendants accurately characterize Sandefur's statement.

In her response, Strickland repeatedly compares her case to *Johnson*, where various black employees brought Title VII claims and the Seventh Circuit denied summary judgment on the hostile work environment claim. 892 F.3d at 900; *see* Pl. Resp. at 6–7. There, one supervisor told Johnson that he "cleaned like a monkey," would "use the n-word around African-American employees" and "mock Johnson as if to say African Americans only speak slang," answer "yo" when Johnson would say "hello," and "rap or say 'I'm from the hood,' or speak using stereotypical African-American slang when African American EVS techs were around." *Johnson*, 892 F.3d at 901. Another supervisor told a different plaintiff not to give him the "black girl ghetto attitude." *Id.* Another plaintiff heard yet another supervisor call different plaintiffs a "black B bipolar" and a "black wig-wearing witch." *Id.* at 902 ("Plaintiff Young testified that she often heard [a supervisor] mocking African Americans and on several occasions ('about three,' she testified), she heard him use the N-word."). Strickland argues that "[i]t is hard to spot a meaningful difference between those facts in *Johnson* and this case, and summary judgment should be denied here for the

same reasons as the Court denied it in *Johnson*." Pl. Resp. at 7 (emphasizing that the "repeated subjection to hearing [the n-word] could lead a reasonable factfinder to conclude that a working environment was objectively hostile.") (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004)).

The Court finds *Johnson* distinguishable. In that case, supervisors repeatedly addressed plaintiffs directly by using derogatory, racial and gendered epithets that can only be construed as hostile and offensive. *Johnson*, 892 F.3d at 904 (finding that the "catalogue" of "racist statements made not only to plaintiffs, but to others" was collectively "sufficient to infer that all of these co-workers knew that their supervisors were repeatedly using racist language towards many employees to define the working environment for all of them . . . in a pervasive way to establish racial and hierarchical dominance in the workplace."). As further discussed below, that is simply not the case here, as Sandefur was not Strickland's supervisor, and he did not (1) refer to Strickland's race when talking about her, (2) call her crazy, bipolar, or a witch, (3) or direct comparably offensive language towards her based on her race or gender.

Defendants cite to numerous Seventh Circuit cases granting summary judgment on gender-based hostile work environment claims, with harassment more severe than here. County Defs. Memo at 12–13 (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832 (7th Cir. 2009) (gender-based conduct "not objectively severe or pervasive" when supervisor commented that plaintiff "was made for the backseat of a car," looked like "a dyke" and a "redneck," and introduced plaintiff as person "in charge of cookies with sprinkles"); *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895 (7th Cir. 2005)

(where employee "spoke down to [plaintiff]," made "a reference to her 'tits'", told "several new male employees to watch out because [the plaintiff] likes good-looking men," "commented on female job applicants' physical appearance," asked the plaintiff "if she had gotten a new set of legs," "made an innuendo about his penis size when a dimension was mentioned by a female co-worker," and "said that a female co-worker 'just needed a good f***", a reasonable person likely would not have found environment hostile within the meaning of Title VII because secondhand harassment is less objectionable and the handful of comments made in a joking context, "as opposed to serious or threatening comments, simply does not rise" to an actionable level); *Patt v. Family Health Sys.*, 280 F.3d 749 (7th Cir. 2002) (department chief's eight gender-related comments, two made directly to plaintiff, which included statement that the "only valuable thing to a woman is that she has breasts and a vagina," were "indeed offensive" but "too isolated and sporadic to constitute severe or pervasive harassment")); Sandefur Memo at 13 (citing *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336 (7th Cir. 2001) (affirming summary judgment for defendants when supervisor referred to plaintiff as "grandma," thought all intelligent women are unattractive, said to a subordinate she dressed "sleazy" and "like a whore," and plaintiff heard others called "bitch" and "whore")); *see Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624 (7th Cir. 2019) (approximately 5-10 comments by a supervisor to plaintiff about her breasts did not create an environment severe enough to show constructive discharge in the context of a hostile work environment claim).

Defendants also cite to cases where courts in this District have denied hostile work environment claims involving similar or more severe and pervasive uses of racial epithets. *Smith*, 388 F.3d at 567; *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (affirming summary judgment for defendants on employment discrimination claims where fellow employees referred to the plaintiff as "black man" repeatedly and a supervisor called him a gorilla in a single incident); *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 565 (7th Cir. 2000) (overruled on other grounds) (affirming summary judgment for defendants where n-word was said at least three specific times to, but not directed to, the plaintiff).

Strickland argues in part that these cases "should be relegated to the dustbin of history." Pl. Resp. at 9–10 (contending that *Scruggs* "should have been sent to a jury" but was "decided before the current societal focus on routing out all forms of discrimination from the workplace as evidenced by the Me-Too Movement, and the heightened intolerance for race-based comments in the workplace in 2021"); *id.* at 11 (*Moser* "is bad law in today's changed context[.]"). However, without explicit instruction from the Seventh Circuit, it is not for this Court to reevaluate established case law based on Strickland's, or the Court's, perceived changes in societal norms.

Strickland also argues that the cases are distinguishable from hers, and that the *Johnson* ruling "follows the far better and more current tempo of contemporary society by suggesting it is up to the jury to decide these issues, not a court on written documents." Pl. Resp. at 9. She contrasts the eight comments made over a five-year span in *Patt* to her own "sixteen incidents pleaded," and argues that the plaintiff in

40

*Moser* alleged "a litany of statements to others" without proffering "a litany of statements to herself and in her presence" like Strickland. Pl. Resp. at 10. The Court is unconvinced, as Strickland fails to distinguish her case as sufficiently more severe or pervasive than the above cases cited by Defendants. It is not only the raw number of alleged incidents that matters, but their severity. *See, e.g.*, *Scaife*, 504 F. Supp. 3d at 903, aff'd sub nom. *Scaife*, 49 F.4th 1109. As discussed below, most of the comments in Strickland's case are less severe, in context, than the *Moser* and *Patt* comments. And here, while the conduct was not spread out over five years, it occurred over the course of at least 18 months. In addition, as already stated, the Court finds *Johnson* involved much more severe and pervasive discriminatory conduct than here, so it is not determinative regarding this case. Ultimately, Strickland fails to cite to any cases with comparable allegations in which summary judgment was denied, and the Court finds this case to be more in line with the cases cited by Defendants than *Johnson*.

The Court is persuaded that, considering all the evidence and circumstances in the light most favorable to Strickland, the conduct she complains of is not sufficient to support a jury finding of a hostile work environment. Strickland does not allege any physically threatening or humiliating conduct, nor does she allege that any conduct interfered with her work performance. Most of the alleged incidents, analyzed in context, while inappropriate, are not particularly severe. *Whittaker*, 424 F.3d at 645. Many were not directly linked to gender or race, and cannot be reasonably inferred as derived from racial animus. These include "you people," "people who cannot communicate with you," "bad officer," "Big Dummy," "stupidness,"

41

"girl," the Van Dyke verdict, and Strickland's failure to wear a vest and or move during roll call. *See Poullard*, 829 F.3d at 858 (comments were mild and ambiguous at worst).

Other incidents, though explicitly gendered or racial, were not directed at Strickland or were not hostile. Strickland merely overheard comments made by Sandefur about the Bible and the Me Too movement. Sandefur calling Strickland "girl" was a one-time incident lacking hostility. Sandefur's comments about not caring about Black History Month, while offensive, were made when rejecting joking comments by an employee (not Strickland) who was insinuating that Black History Month might justify treating black employees favorably. While Sergeant Edwards told Michelle that she should brush his beard because he is "the man," he immediately apologized when she called the comment offensive. And Sandefur telling Officer Voytas to be "a man" was an isolated incident and, as a joke, was not particularly hostile.

Sandefur's use of the n-word, both in reference to his own brother and while at roll call when instructing others not to use the word, is reprehensible and the most severe conduct alleged by Strickland. However, Defendants are correct to point out that those words were not directed at Strickland or any black people. And Sandefur's use of the word during roll call, while objectionable and obnoxious, was not motivated by animus nor heard by Strickland herself. As Sandefur explained, and as other corroborated, he used the word for shock value while telling people not to use the

word. His story is not contradicted by Strickland's testimony and is less inflammatory than the story alleged in Strickland's EEOC charge.

Sandefur's alleged pattern of behavior strikes the Court as inappropriate at best. Taking the facts in the light most favorable to Strickland, the Court does not doubt Strickland's subjective feelings of offense. Sandefur's comment that no woman would tell him what to do demonstrates ignorance. Sandefur telling Officer Voytas to act like a man and take Strickland's jacket is, generously interpreted, a juvenile and backwards joke. His expressing that women should just get over the Me Too movement is offensive, and his use of the n-word disgraceful. The Court agrees that many of Sandefur's comments are "completely inappropriate for the workplace." Pl. Resp. at 9. However, "Title VII is not a code of civility." *Yuknis*, 481 F.3d at 556 ("The pluralism of our society is mirrored in the workplace, creating endless occasions for offense. Civilized people refrain from words and conduct that offend the people around them, but not all workers are civilized all the time."). Further, the law requires not just Strickland's subjective feelings of offense, but that a reasonable person would find the environment to be hostile or abusive. *See Cook Cnty. Sheriff's Off.*, 53 N.E.3d at 1154. Considering that the vast majority if not all of the alleged conduct is either—or some combination of—secondhand, isolated, or lacking in racial or gender animus or hostility, the Court concludes that no reasonable jury could find the alleged conduct so severe and pervasive that it altered the conditions of Strickland's employment. Her claims fail as a matter of law.

V. **Basis for Employer Liability**

Because the Court finds Strickland's conditions of employment were not altered by severe and pervasive conduct, Defendants are not liable and the Court's analysis could end. However, the County Defendants also contend summary judgment is warranted in their favor even if Strickland suffered such severe and pervasive harassment that it altered the conditions of employment, because Strickland does not establish the fourth element of her claim—a basis for employer liability. County Defs. Memo at 18–19; *Smith*, 936 F.3d at 560. The Court will address the argument, finding that for this additional reason, summary judgment in favor of the County Defendants is warranted.

"Two bases for imposing employer liability exist under Title VII. If [a] 'supervisor' commits the alleged harassment and it culminates in a tangible employment action, the employer is strictly liable for the harassment, subject to any available affirmative defenses. . . . If the alleged harasser is the victim's co-worker, on the other hand, the employer is liable only if it was negligent in discovering or remedying the harassment." *Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1007 (N.D. Ill. 2014) (internal citations omitted); *see Vance*, 570 U.S. at 431 ("[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'") (citation omitted).

44

As explained above, the Court finds that Sandefur was not Strickland's supervisor for Title VII purposes. Therefore, the Sheriff's Office should only be held liable if it was "negligent either in discovering or remedying the harassment." *Parkins v. Civ. Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998); *see Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) ("Under Title VII, an employer can avoid liability for hostile environment sexual harassment if it promptly investigates a complaint when made and then, if warranted, 'takes steps reasonably likely to stop the harassment.'") (citation omitted). The County Defendants maintain they were not negligent in discovering or remedying the harassment. They point out that Strickland never submitted written complaints of racial or sexual harassment. Indeed, she filed her OPR complaint register seven months after filing her EEOC charge. And Sandefur was promptly reassigned to a different unit roughly one month after she submitted that OPR complaint register.

Strickland admits that "the CCSO reassigned Sandefur to a different unit and a representative from HR attempted to meet with Plaintiff," but argues that "these steps were taken long after Sandefur repeatedly harassed Plaintiff and after" she and others had complained about harassment to Lt. Martin, Sandefur, and Sergeant Edwards to no avail. Pl. Resp. at 13 (Strickland told Lt. Martin about petty orders during roll call, racism, screaming, hollering, and the n-word, and told Ledesma about the "stupidness" comment).

The Court finds that Defendants have established that they were not negligent in discovering the harassment, because before Strickland filed her OPR complaint,

Strickland did not put the CCSO on notice of her claims of discrimination. County Defs. Reply at 7–9. "Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Parker*, 50 F. Supp. 3d at 1007 (quoting *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866–67 (7th Cir. 2013)). Here, Strickland admits that she always knew she could file an OPR complaint register, and that Lt. Martin always told her that she could formalize her complaints in writing and he would forward them up the chain of command. Still, he never did, because she did not ask. Further, while she complained to Ledesma about Sandefur's "stupidness" comment and Sandefur talking to her inappropriately, Ledesma never indicated that Ledesma would pass on Strickland's complaints. Indeed, Strickland asserts that Ledesma encouraged her not to report anything. Pl. Resp. at 13. Nor is there any indication that Sergeant Edwards had reason to, or was likely to, report what Strickland told him. Thus, "it was unreasonable for Plaintiff to believe that [Ledesma, Lt. Martin, or Sergeant Edwards] would convey [her] complaints up the ladder[.]" *Parker,* 50 F. Supp. at 1010; *Parkins,* 163 F.3d at 1038 ("A reasonable person, realizing that her complaints were ineffective, would then seek a remedy elsewhere."). The Court therefore finds that the Sheriff was not negligent in discovering the harassment.

Strickland argues that the subsequent OPR investigation, which did not sustain her allegations of discriminatory conduct, was a sham investigation designed

to clear Sandefur. Pl. Resp. at 14–16 (CCSO's negligence "speaks for itself.") (citing *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) ("In a typical sham investigation, persons conducting the investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses).")). Strickland asserts that the OPR investigator, Martinez, did not interview Strickland or most of the witnesses Strickland named in her complaint. Rather, Martinez only interviewed one of the five witnesses. Further, argues Strickland, Martinez's notes lacked thoroughness and transparency because she did not record the interviews verbatim. Strickland also criticizes Martinez for not asking questions to Officer Elmore about Sandefur's use of the n-word. Pl. Resp. at 14–16.

As Defendants argue, the CCSO investigation was adequate on its face. While Martinez did not interview Strickland herself, another OPR investigator did interview Strickland, and Martinez also interviewed Juan Herrera, Officer Voytas, and Sergeant Edwards. Strickland does not offer deposition testimony or declarations from the witnesses she believes Martinez should have interviewed and does not show that the CCSO was willfully blind to the facts. Neither does she cite any law for the proposition that verbatim recordation is required, that summaries are inadequate, that an investigator must interview all the witnesses identified by a complainant, or that this was an inadequate investigation. *See Tutman v. WBBM-TV/CBS Inc.*, 54 F. Supp. 2d 817, 827 (N.D. Ill. 1999), aff'd sub nom. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044 (7th Cir. 2000) (concluding investigation was sufficient as a

matter of law when it included multiple interviews, plaintiff did not dispute a single paragraph, and plaintiff failed to cite any cases in support). Also, because Strickland's OPR complaint dealt only with the Black History Month incident, Martinez had no reason to ask about any instances of the n-word or other alleged misconduct from the EEOC charge. Lastly, even though the County Defendants did not sustain Strickland's OPR complaint, Sandefur was transferred approximately one month after it was filed, and Strickland's complaint in this case identifies no further discriminatory harassment she suffered after the transfer. For these reasons, the CCSO "promptly investigate[d] [the] complaint when made" and took "steps reasonably likely to stop the harassment." *Van*, 332 F.R.D. at 276.

Accordingly, Strickland does not establish a basis for employer liability, and for this additional reason, her hostile work environment claims fail.

## Conclusion

For the foregoing reasons, Sandefur's and the Sheriff's and County's motions for summary judgment are granted. Strickland's hostile work environment claims fail against Sandefur, the Sheriff, and the County. The Sheriff and County are terminated from this case. Strickland's supplemental complaint, which brings claims against Sandefur, Siroky, and Parker, remains operative, and the motion to dismiss filed by Siroky and Parker remains pending. R. 135, Mot. Dismiss. Sandefur has answered the supplemental complaint, R. 129, and discovery in this case is finished. R. 166. Therefore, by April 7, 2023, Sandefur shall file a status report informing the

Court whether he intends to file a dispositive motion on the remaining claims against him.

Dated: March 31, 2023

_____
United States District Judge
Franklin U. Valderrama